■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LYDELL CHISM, Appellant. [598 NYS2d 481] —Judgment of the Supreme Court, New York County (Carol Berkman, J.), rendered on July 1, 1991, convicting defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree

and sentencing him to a term of incarceration of 45 days to run concurrently with a five-year term of probation, is unanimously reversed on the law, the judgment of conviction vacated and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of a copy of this Court's order upon the respondent, with leave during this 30 day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

At approximately 6:30 P.M. on November 5, 1990, Police Officers Seth Gahr and Perry McGee were driving in their unmarked car on Lenox Avenue and 135th Street, an area where some armed robberies had recently occurred. While the vehicle was stopped at a traffic light, they noticed an automobile across the street parked at an angle and protruding into the street. According to the court's fact-finding, "there was somekind [sic] of small hole which the officer took to be characteristic of a bullet hole in this vehicle." Notwithstanding that there was also some testimony about a flat or deflated tire, as well as a question as to whether the car was legally parked, the Judge determined that it was clear that "this is not a vehicle and traffic law stop." In any event, the police car proceeded past the subject vehicle, and the officers saw that the four occupants were, in the description of the Judge, "all looking at one store which is about to close; whether it was to conclude they are going to wait until the store closes completely and the person walks out with the day's proceeds or whatever is to be concluded from that but one can certainly understand with four people just sitting in a car, perhaps they are waiting for somebody to come from the hospital. Perhaps they are waiting for Godot."

The two officers parked behind the automobile and approached. Officer Gahr stated at the suppression hearing that he intended to question the occupants about the bullet hole and flat tire, but he was unable to recall whether he drew his revolver as he neared the driver's side; McGee advanced on the passenger's side. Defendant, who was seated in the back, was observed to make an "abrupt movement" with his hand toward his pants pocket. Defendant complied with Officer Gahr's request that he exit the car, and the policeman touched defendant's pocket, removing a gun. The weapon had not been at all noticeable prior to the pat-down. Defendant was then placed under arrest. Significantly, the court observed

that "I thought that the officer was quite candid when, in saying that—when the defendant got out, he thought that there couldn't be a gun in the pocket because of the jeans [worn by defendant]. His testimony, however, was that he first touched it and recognized what he felt to be a gun."

Defendant claimed at the hearing that he and his three friends were waiting for one of the men's sister, who was visiting someone at Harlem Hospital. The automobile, he asserted, was legally parked and did not have a flat tire although there was a small hole in the windshield. The officers drove past and then parked behind them. Officer Gahr tapped on the window with his revolver, a claim denied by the officer, and both policemen approached with their guns drawn. Defendant rejected the notion that he flinched or made any motions towards his pants. He stated that Officer McGee asked one of his companions to step out of the car, while Officer Gahr demanded the driver's license and registration. Thereafter, Officer Gahr conducted a frisk of the driver, and Officer McGee searched the individual who had been in the front passenger seat. The police also examined the area under the steering wheel and the front seats. When defendant exited the vehicle, Officer Gahr started searching and recovered the gun, which defendant had purchased for protection.

In denying the motion to suppress, the Supreme Court found that the officers approached the car in which defendant was riding because of concern that its four male occupants might be planning a robbery, and "[t]here's a hole in the windshield. It's a high robbery area. I don't think the officer needs to know specifically which stores have been victimized in this regard; that the officer had, at least, reasonable ground to inquire under De Bour, he did not, and stop this vehicle, which might require whether * * * the vehicle was already at the curb, whether perfectly parked or not. I don't know that I need to resolve that and the officer then testified that the defendant reached toward a pants pocket and that he was concerned at that point with his safety." In the opinion of the Judge, "the officer has the right to take reasonable self-protective measures, including, I would think, ordering an occupant out of a vehicle wherever the vehicle may be approached and whether or not it's on a lonely road or in a very populated area." However, contrary to the court's belief that the officers were warranted in being apprehensive over their safety (a surprising conclusion in view of its acknowledgment that Officer Gahr had remarked that defendant's wearing jeans precluded his having a gun in the pocket), and, therefore,

stopping and frisking defendant, the facts elicited at the suppression hearing simply do not support such a determination.

The Court of Appeals, in *People v Hollman* (79 NY2d 181, 189), recently discussed its prior decision in *People v De Bour* (40 NY2d 210), explaining that

"[i]n *De Bour*, we framed the issue as 'whether or not a police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information' * * *.

"We held that the approach and the questioning were permissible because they were supported by an articulable reason that justified the police action taken".

The Court then declared *(supra,* at 190) that: "An obvious starting point in our effort to clarify the difference between a request for information and a common-law inquiry is an examination of the type of questions asked in *De Bour.* The officers asked the defendant what he was doing in the neighborhood and then asked for identification. These questions we permitted as part of a request for information. Thus, *De Bour* suggests that even in their law enforcement capacity, police officers have fairly broad authority to approach individuals and ask questions relating to identity or destination, provided that the officers do not act on whim or caprice and have an articulable reason not necessarily related to criminality for making the approach *(id.,* at 219). *De Bour* also stands for the proposition that the brevity of the encounter and the absence of harassment or intimidation will be relevant in determining whether a police-initiated encounter is a mere request for information."

The Court of Appeals further emphasized that "a request for information is a general, nonthreatening encounter in which an individual is approached for an articulable reason and asked briefly about his or her identity, destination, or reason for being in the area. If the individual is carrying something that would appear to a trained police officer to be unusual, the police officer can ask about that object" *(People v Hollman, supra,* at 191). However, the Court pointed out, once the officer's inquiry focuses on specific criminality, "this is not a simple request for information. Where the person approached * * * might reasonably believe that he or she is suspected of some wrongdoing, the officer is no longer merely asking for information. The encounter has become a common-law inquiry that must be supported by founded suspicion that

criminality is afoot" *(supra,* at 191). In that regard, it is clear that the police action in the instant situation exceeded the bounds of a simple request for information, yet the officers lacked any reasonable basis for believing that defendant or his friends had been engaged in a crime or either were in the process of committing, or about to commit, an illegality.

In *People v Morrison* (161 AD2d 608), police officers on routine patrol in a high crime area observed a vehicle in a parking lot, the motor running and its nose abutting a building. Two males were sitting in the front seats. The police car pulled in behind the subject vehicle as it was attempting to leave, and the officers exited, one of them walking up to the driver's side and the other up to the passenger's side. The defendant therein was directed to shut off the motor and produce his license, registration and insurance card. In attempting to comply, the defendant opened the glove compartment. A glass pipe and sifting screen fell out, so the defendant and his companion were ordered out of the automobile. When one of the officers bent to retrieve the contraband, he saw a weapon under the passenger's seat, and both men were placed under arrest. In reversing the judgment of conviction and suppressing the physical evidence, the Court stated that "[t]he actions taken by the police clearly amounted to a stop and a seizure of both the car and its occupants * * * and therefore required some reasonable suspicion that criminal activity had been, was about to or was presently occurring * * *. There was no such indication here and the fact that this was a high-crime area, in the absence of any other articulable justification for the stop, will not suffice to attribute to the officers' actions the appropriate level of reasonable suspicion needed to make this seizure lawful" *(supra,* at 608-609).

Under the standard enunciated in *People v De Bour (supra)* and its progeny, the most that the officers here were authorized to do is solicit information from the occupants of the vehicle. While the bullet hole, possible flat tire and the direction in which the men were facing might have roused their suspicions, these facts are simply insufficient to form the predicate for anything more than a request for information. Thus, a broken window, without more, does not provide a reasonable suspicion that criminal activity is afoot *(People v Elam,* 179 AD2d 229, *lv granted* 79 NY2d 1056, *appeal dismissed* 80 NY2d 958). Similarly, a quick hand motion by the occupant of a vehicle is, absent other circumstances suggestive of criminal conduct, not in itself suspicious *(People v McCready,* 121 AD2d 897, *appeal dismissed* 68 NY2d 981). As the

Court of Appeals stated in *People v Russ* (61 NY2d 693, 695), "[a] frisk requires reliable knowledge of facts providing reasonable basis for suspecting that the individual to be subjected to that intrusion is armed and may be dangerous" *(see also, People v Carney,* 58 NY2d 51; *People v Benjamin,* 51 NY2d 267).

Since defendant's purported "abrupt movement" was not enough, standing alone, to permit an inference that he was armed and dangerous, Officer Gahr was not justified in touching him in any manner. Indeed, under the circumstances herein, the police conduct was inappropriately intrusive to the extent that it exceeded their right to make a simple inquiry, including the officers' demand that any of occupants exit the vehicle *(see, People v Howard,* 147 AD2d 177, *appeal dismissed* 74 NY2d 943). Where, as herein, the appearance of the car in which defendant was riding, as well as the actions of the occupants "viewed either separately or together, was plainly susceptible to interpretation as innocent behavior. * * * [T]he combining of such otherwise innocuous actions and behavior in a setting described as a 'high crime area' does not expand the powers of the police to the detriment of those individuals who happen to live or work in, or are passing peaceably through, such a neighborhood" *(People v Cornelius,* 113 AD2d 666, 670). In a case similar to the one involved here, *People v Williams* (79 AD2d 147), this Court found improper a police search which occurred when the officers grabbed defendant and seized a revolver from him after he exited a parked car in which he and two companions had been observed talking and looking toward a building. Consequently, the officers' actions herein were impermissible even accepting their version of the events resulting in defendant's arrest. Concur—Sullivan, J. P., Milonas, Asch and Rubin, JJ.